**UNITED STATES**

v.

**Senior Airman Daniel J. DATAVS, United States Air Force.**

**ACM 37537.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 2 July 2009.

9 Nov. 2011.

Appellate Counsel for the Appellant: Major Michael S. Kerr (argued); Colonel Eric N. Eklund (on brief); Lieutenant Colonel Gail E. Crawford; Lieutenant Colonel Darrin K. Johns; Major Shannon A. Bennett; and Major Anthony D. Ortiz.

Appellate Counsel for the United States: Captain Michael T. Rakowski (argued); Colonel Derence V. Fivehouse (on brief); Colonel Don M. Christensen; Lieutenant Colonel Jeremy S. Weber; Major Naomi N. Porterfield; and Gerald R. Bruce, Esquire.

Before BRAND, ORR, and ROAN, Appellate Military Judges.

## OPINION OF THE COURT

ORR, Senior Judge, delivered the opinion of the Court, in which BRAND, Chief Judge, joined:

Contrary to his pleas, a general court-martial composed of officer and enlisted members convicted the appellant of one specification of making a false official statement, one specification of forcible anal sodomy and one specification of forcible oral sodomy, in violation of Articles 107 and 125, UCMJ, 10 U.S.C. §§ 907, 925. The adjudged sentence consisted of a dishonorable discharge, forfeiture of all pay and allowances and reduction to the grade of E–1. The convening authority approved the sentence as adjudged. The appellant raises four issues for our consideration: 1) whether his trial defense counsel were ineffective; 2) whether the military judge abused his discretion by not permitting trial defense counsel to argue the mitigation of sex offender registration through reasonable inference and common knowledge; 3) whether the convening authority violated Rule for Courts–Martial (R.C.M.) 1107(d)(2) by approving total forfeitures of pay even though the appellant received no confinement; and 4) whether the appellant's sentence to a dishonorable discharge was too severe. We heard oral argument on this case in the courtroom of the Supreme Court of Nevada in Las Vegas, Nevada, as part of our Outreach Program. After considering the record of trial, the briefs and arguments of counsel, with the exception of issue three, we find no error that materially prejudices a substantial right of the appellant and affirm. We take direct corrective action for the im-

proper convening authority action in our concluding paragraph.

### Background

The appellant was a Special Operations Equipment Maintenance member stationed at Cannon Air Force Base (AFB), New Mexico. Approximately a month and a half prior to the events leading to his court-martial, the appellant met SF, a woman who lived approximately 30 minutes from Cannon AFB. They saw each other on a weekly basis at softball games and the relationship between the appellant and SF progressed to a consensual sexual relationship. Late in the evening of the 14th of June 2008, the appellant asked SF to come to his apartment to discuss his upcoming deployment to Turkey. SF agreed and arrived at approximately 0200 the following day. SF knocked on the door and woke the appellant's roommates, a married Airman and his wife who were renting out an extra room to the appellant. SF told them she was there to see the appellant and they let her in. SF then went to the appellant's room where she found the appellant asleep so she woke him. They began kissing and quickly progressed to having consensual vaginal intercourse.

SF testified at trial that, unlike their first sexual encounter, the appellant became demanding. He asked her to perform oral sex to which she told the appellant "no," but he pulled her head down and forced her to take his penis into her mouth. They then engaged in vaginal intercourse again, and although SF said she was now afraid, she continued because she did not want to make the appellant angry by refusing. SF testified the appellant put her into uncomfortable positions during intercourse, which caused her pain, but again, she did not complain to the appellant. At one point, the appellant slapped SF in the back and told her she "wasn't in the right position." SF then testified the appellant told her he wanted to have anal sex. She told the appellant "no," but according to SF, the appellant proceeded despite her refusal. SF said the anal sex

hurt so she shifted her weight and position, causing the appellant to stop. They then engaged in vaginal intercourse again, followed by SF performing oral sex on the appellant a second time.[1] Afterwards, SF and the appellant talked and she left the house.

SF went home and then went to church later in the day. That night, she told her mother "I may have been raped." Her mother advised her to go to the hospital for a rape examination. SF agreed and was seen by TB, a registered Sexual Assault Nurse Examiner (SANE), and a family acquaintance. SF told TB that she had been sexually assaulted, to include being anally penetrated against her will. TB took several pictures and wrote a report outlining her findings. SF filed a complaint with Detective RP of the Clovis Police Department in New Mexico. On 23 June 2008, she told the detective that, although they started out having consensual vaginal sex, the appellant forced her to engage in oral and anal sex. On 28 July 2008, Detective RP and Special Agent PC of the Air Force Office of Special Investigations, interviewed the appellant in response to SF's allegations. After being properly advised of his rights, the appellant told them the oral sex with SF was consensual. Initially, the appellant told the investigators that he had never had anal sex. When pressed, he said it may have "slipped in when he was from behind" but he pulled out and because it happened so quickly he did not consider it anal sex. Finally, he gave a written statement saying, "I asked her if she wanted to try anal. I had never tried it before and she said she was willing to try it."

### Ineffective Assistance of Counsel—Part A

Prior to trial, defense counsel[2] asked the convening authority to appoint a SANE to the defense team to assist during case preparation and to possibly testify in the defense's case-in-chief. The convening authority denied the request. Trial defense counsel then submitted a motion to compel production of a

---

1. SF testified the appellant forced her to perform oral sex on him a second time but the appellant was acquitted of this allegation.

2. The appellant was represented by a senior defense counsel (SDC) and an area defense counsel (ADC).

598

SANE expert with the military judge, saying:

> An expert consultant SANE is a necessity in Defense preparation of this case. No member of the Defense team has received formal or informal training regarding forensic evidence collection from a complainant after an allegation of sexual assault. Defense consultant will be utilized to confirm the accuracy of the findings of Government's SANE .... the consultant may assist as a witness to explain said favorable evidence to court.... There is a reasonable probability that not ordering the appointment of such an expert would result in a fundamentally unfair trial.

Prior to the start of the court-martial, and before the judge could rule on the motion, trial defense counsel interviewed TB for several hours. Based on this conversation, counsel determined TB's testimony would not harm the defense's case if she only discussed the anal injuries she observed rather than the vaginal trauma she noticed. Defense counsel then entered into an agreement with the prosecution, electing to withdraw the motion to compel on the condition that the government's SANE expert, TB, would not testify about the vaginal injuries she observed during the victim's sexual assault examination, and would limit her testimony to portions of the examination related to the injuries to the anus only.

At trial, TB's testimony was apparently not what defense counsel expected. Rather than the benign comments they thought she would make regarding the anal injuries, she testified the victim suffered extensive blunt force trauma to the area and opined the injuries were consistent with "forced anal penetration by a man's penis." TB also testified that you would not usually see any lacerations from consensual sodomy "because that particular sexual act is for pleasure, not for pain and when it's done in a controlled environment with ... lubrication, [and a] willing party ... it doesn't usually have injury with it." During TB's direct examination, and then again on cross-examination, TB acknowledged the injuries she observed could have been caused by consensual anal sodomy.

Later she testified it was possible, but unlikely that an unlubricated penis would just slip inside of an anus.

The defense's case-in-chief consisted solely of the roommate's testimony that he did not hear SF or the appellant after SF entered the apartment. The appellant did not testify and trial defense counsel did not renew their request for a sexual assault expert.

On appeal, the appellant argues his trial defense counsel were ineffective for a litany of reasons, chief among them, their failure to obtain an expert consultant in the field of sexual assault examinations.

*Law*

Service members have a fundamental right to the effective assistance of counsel at trial by courts-martial. *United States v. Davis,* 60 M.J. 469, 473 (C.A.A.F.2005) (citing *United States v. Knight,* 53 M.J. 340, 342 (C.A.A.F.2000)). We review claims of ineffective assistance of counsel de novo, *United States v. Wiley,* 47 M.J. 158, 159 (C.A.A.F. 1997), under the two-part test enunciated in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See also* 2 Steven A. Childress & Martha S. Davis, *Federal Standards of Review* § 12.09 (2d ed. 1992). To prevail on claims of ineffective assistance of counsel, the appellant must show: 1) his counsel's performance was so deficient that he was not functioning as counsel within the meaning of the Sixth Amendment[3]; and 2) his counsel's deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. We start with the proposition that defense counsel are presumed to be competent. *United States v. Anderson,* 55 M.J. 198, 201 (C.A.A.F.2001). The appellant bears the heavy burden of establishing that his trial defense counsel was ineffective. *United States v. Garcia,* 59 M.J. 447, 450 (C.A.A.F. 2004). Our superior court has established a three-part test to determine whether the presumption of competence has been overcome:

> 1. Are the appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?

---

3. U.S. Const. amend. XI.

2. If the allegations are true, did defense counsel's level of advocacy "fall [ ] measurably below the performance ... [ordinarily expected] of fallible lawyers"?

3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*United States v. Polk*, 32 M.J. 150, 153 (C.M.A.1991) (citations omitted).

### Discussion

The appellant contends his attorneys were unable to prepare an effective defense or to successfully challenge the government expert's conclusions because they did not have the medical knowledge sufficient to understand the subject material. Additionally, the appellant maintains his trial defense counsel did not have a viable tactical reason for withdrawing the motion to compel an expert. The appellant points out the rape allegation had been dismissed and the victim admitted to having consensual sex, making the evidence about vaginal injuries "benign, or at least superfluous." The appellant argues, "Defense counsel[s'] explanation for withdrawing their motion does not explain how the defense felt competent to proceed in a forcible sodomy case when they remained ignorant regarding SANE examinations, especially the medical research related to anal sex."

The fact that neither counsel possessed specialized knowledge concerning sexual assault examinations is not by itself sufficient to conclude defense counsel were ineffective. *United States v. Hammer*, 60 M.J. 810, 822 (A.F.Ct.Crim.App.2004) ("[T]here is no rule of law that requires a defense counsel to seek the assistance of an expert simply because the government is presenting expert testimony in the case."). It is only when counsel show they are unable to gather and present evidence without expert assistance that there is a due process entitlement to the appointment of an expert. *United States v. Short*, 50 M.J. 370, 373 (C.A.A.F.1999). The relevant question is whether defense counsels' deliberate and voluntary decision to withdraw the motion to compel was based on

sound tactical or strategic reasoning. We believe it was.

According to the trial defense counsels' post-trial affidavits, their rationale for withdrawing the request for a SANE expert was two-fold:

First, they believed TB's testimony would not be harmful to the defense if she only testified about the anal injuries she observed. During pretrial interviews, TB told defense counsel that "the trauma she documented in [SF's] vagina was some of the worst she had ever seen," and would have caused SF a great deal of pain during intercourse. "In contrast, [TB] did not speak in such terms regarding her anal findings. She indicated that the trauma to [SF's] anus was considerable, but she agreed the injuries could have been caused by a first-time experience with anal sex, a single insertion of the penis, or even a partial insertion of the penis." Consequently, "[a]s a result of our interview, it was clear that if the government intended to get into the vaginal examination, we would need a SANE to keep [TB] from injecting her own assumptions into her testimony; however, there were no such similar indications regarding the anal examination." The defense was also concerned about potential spillover that could result if TB discussed the vaginal injuries even though the victim admitted the vaginal sex was consensual.

Second, they did not want to delay the case. In her affidavit, the area defense counsel (ADC) stated she had spoken with two witnesses, SF's ex-boyfriend and the appellant's ex-girlfriend, both of whom she opined could provide damaging testimony about the appellant. Because the government had apparently not spoken with either individual, the defense wanted to get to trial before they could be interviewed by the prosecution. The appellant apparently wanted to proceed to trial as soon as possible because he had already been waiting for over a year for resolution of his case. According to the senior defense counsel (SDC), the SANE expert they wanted would not be available on the agreed upon start date, necessitating a delay.[4]

4. At the same time the defense withdrew their motion to compel the sexual assault nurse exam-

Appellate courts give great deference to trial defense counsel's judgments, and "[a]s a general matter, [the court] will not second-guess the strategic or tactical decisions made at trial by defense counsel." *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F.2009) (quoting *Anderson*, 55 M.J. at 202). *See also United States v. Morgan*, 37 M.J. 407, 409 (C.M.A.1993). We find trial defense counsels' decision to withdraw the request for expert assistance before the trial was made after careful determination that such a course of action was in the best interest of the appellant. Counsel had a reasonable basis to be concerned that TB's testimony concerning SF's vaginal injuries would spillover to the anal sodomy specification. SF had previously testified at the Article 32, UCMJ, 10 U.S.C. § 832, hearing that some of the instances of vaginal intercourse that occurred were in fact unwanted and caused her a great deal of pain. Defense counsel believed that SF's accounting of the vaginal pain was supported by TB's findings. As the SDC explained in his post-trial affidavit:

> [I]f the members were to see the vaginal portion of the SANE report, they might surmise that the tears, lacerations and abrasions noted by [TB] corroborated [SF's] unwilling participation in the subsequent vaginal intercourse. If the members were to draw that conclusion, then it was logical to believe they would be more likely to view the acts of oral and anal sodomy as nonconsensual as well. By securing an agreement from the government to keep the SANE report out of evidence, we effectively eliminated this danger to the defense case.

The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time decisions are made, not on how they now appear in hindsight. *United States v. Moulton*, 47 M.J. 227, 229 (C.A.A.F.1997) (citing *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). The appellant's counsel made the decision to withdraw the request for an expert in order to limit TB's testimony about the vaginal injuries only after extensively interviewing TB. Counsels' decision

was justified by the facts of the case and the information derived from TB. Determining whether to make such a tradeoff is just one of the many tactical decisions that defense counsel must make while formulating a trial strategy, and it is precisely the reason appellate courts are proscribed from second guessing counsel. *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F.2000) (citing *Morgan*, 37 M.J. at 410).

 While we find the defense decision to withdraw the request for an expert in exchange for limiting TB's testimony was within the bounds of reasonable performance expected from competent counsel, we conclude that defense counsels' failure to seek production of a SANE expert after TB testified was not. As previously mentioned, counsels' initial decision not to seek expert assistance was a reasonable trial strategy based on pretrial discussions with TB. However, once trial defense counsel realized TB's testimony changed from the expected benign description of the anal injuries to providing her opinion that the trauma was extremely significant and resulted from forcible penetration, accompanied by a substantial discussion of the medical findings she made during her examination, trial defense counsel should have realized they were unprepared to cross-examine her. Because of the importance of TB's testimony and counsels' unfamiliarity with the subject matter, the prudent course of action would have been to ask the military judge for a delay to request expert assistance. We find counsels' failure to obtain expert assistance at this point of the trial fell measurably below the performance ordinarily expected of fallible lawyers. *See Polk*, 32 M.J. at 153. By defense counsels' own admission, they did not have the training or expertise to fully understand the medical evidence presented by TB. Nevertheless, defense counsel elected to conduct cross-examination without the benefit of expert assistance. Despite their lack of expertise, however, they were successful in getting

---

iner (SANE) expert, the military judge granted a two-month delay request from the government

due to witness availability.

TB to admit that SF's anal injuries could have been the result of consensual sex.

Our determination that counsels' performance was deficient is not based on the advantage of hindsight. Following trial, at the urging of his trial defense counsel, the appellant hired BO, a registered SANE nurse with 17 years of experience, to review the record of trial and provide a second opinion. BO reviewed the testimony of TB from the Article 32, UCMJ, hearing and the court-martial, as well as the exam photographs. BO disagreed with many of TB's conclusions. She criticized TB's experience, methodology, and the procedures she employed to make her findings. BO's opinion illustrates that a SANE expert's assistance would have raised the level of trial defense counsels' performance in this case; however, that does not end our inquiry.

Having concluded the appellant's defense counsels' performance was deficient, we must next determine whether there is a "reasonable probability that, absent the errors," there would have been a different result. *Polk*, 32 M.J. at 153. Based on the entire record of trial, and the matters submitted by the appellant, we do not find there would have been a different result.

The crux of the appellant's argument is that his trial defense counsels' decision to proceed without expert assistance led to his conviction. We disagree. The outcome in this case was based primarily upon the credibility of SF and Detective RP. Trial defense counsel pointed out the many inconsistencies in SF's testimony during cross-examination and closing argument. The panel members had an opportunity to hear SF's and Detective RP's testimony and to observe their demeanor. After hearing their in-court testimony and the arguments of counsel, the members concluded the appellant made a false official statement when he claimed, "I've never, ever had anal sex," and "it may have slipped if I was going from behind or something." They also found the appellant forced SF to perform oral sex on him without her consent in the first instance. Additionally, they found the appellant guilty of committing forcible anal sodomy.

The trial defense counsels' decision not to renew their request for expert assistance is primarily relevant to the specification alleging forcible anal sodomy. After comparing SF's testimony to the appellant's 15 August 2008 written statement, both indicate that the two of them engaged in anal sodomy. The critical difference in their versions of the event is whether the anal sodomy occurred by force and without SF's consent. In this case, the government called TB to assist the court members in deciding these two critical differences. The appellant asserts that the members decided the issue of consent adversely to him because his counsel did not renew their request for expert assistance and as a result, TB's testimony essentially went unchallenged. He argues that a defense SANE consultant would have enabled the defense to undermine the testimony of the government expert. We disagree.

Without question, the report submitted by BO is highly critical of TB's report, her testimony, and the defense counsel's performance during cross-examination. However, the two expert opinions are fairly consistent on three key points: first, that SF sustained some injuries to her anus; second, that some force is necessary to perform anal sex; and third, that SF's injuries could have occurred from either consensual or non-consensual anal sex.

TB's SANE report and testimony corroborate SF's and the appellant's statements that they engaged in anal sex on 15 June 2008. TB testified her examination revealed SF sustained injuries from trauma that caused her anus to be "open" with "quite a bit of dilatation." Even though BO disagreed with TB's description of the nature and extent of SF's injuries, she acknowledged that the laceration on SF's anus was actively oozing. Both experts agree that assuming SF and the appellant engaged in anal sex, some amount of force occurred. BO stated that "it would take some force to have anal sex, whether consensual or non-consensual. Force is going to be needed to get a penis in an anus in any situation." As previously stated, TB testified that SF's injuries were most likely caused by "forced anal penetration by a man's penis," but offered sever-

al medical theories explaining how they could have occurred during consensual anal sex. Neither expert gave a definitive opinion on the issue of consent. In fact, they chose not to do so. Although TB opined that "[t]wo people who are experienced with anal sex normally don't incur injury," BO asserts the injuries could have occurred during consensual or nonconsensual sex, even between people experienced with anal sex "due to the sensitivity of the anus and the fact that it is not meant to be entered." Despite her criticism of TB's testimony and lack of experience, BO concluded that "all of the descriptions [TB] has described [ie. lacerations, swelling of the tissue] could occur with consensual or nonconsensual sex." Given the fact that both experts agree that force was necessary to engage in anal sex and SF's injuries could have resulted from consensual or nonconsensual sex, we are not convinced that there is "a reasonable probability" that, even if she assisted the defense counsel during the trial, there would have been a different result. *See Polk,* 32 M.J. at 153. As such, we find the appellant did not suffer any prejudice as a result of trial defenses' deficient performance in failing to seek a SANE expert after TB testified.

*Ineffective Assistance of Counsel—Part B*

■ Separate from the failure to obtain a SANE expert, the appellant argues his counsel made several other mistakes that amounted to ineffective assistance. He contends trial defense counsel failed to challenge two panel members who were also victim advocates, one of whom had been an acting Sexual Assault Response Coordinator (SARC) for a short period; counsel failed to seek admission of telephone records for the purpose of impeaching SF; counsel failed to effectively argue a mistake of fact defense during closing argument; and counsel failed to introduce evidence during sentencing proceedings that the appellant would be required to register as a sex offender. Having reviewed the record, it is clear the appellant's counsel acted well within the professional norms expected of able defense counsel with regard to the matters raised by the appellant. Accord-

ingly, we need only briefly comment on the appellant's concerns.

During voir dire, two panel members, Captain (Capt) EW and Master Sergeant (MSgt) SG, each stated they attended sexual assault training and had been appointed as victim advocates, but neither had actually assisted any victims to that point.[5] Nonetheless, the appellant asserts "[v]ictim advocates volunteer for their positions because they sympathize with those individuals that claim to have been sexually assaulted." Therefore, "[a]ny reasonable defense attorney would challenge these types of panel members." We disagree. In her post-trial affidavit, the ADC explained how she and her co-counsel discussed with the appellant whether to seek removal of the two members, but decided that keeping both on the panel would be advantageous. Trial defense counsel were both of the opinion that the two members kept a "balance among the sexes on the panel" and based on their answers during voir dire, they felt the two members, both women, "would take offense to a female displaying similar characteristics [ie. strong and athletic] suddenly claiming she was to[o] afraid to defend herself or fight back." Defense counsels' strategy was reasonable and not ineffective. Furthermore, in response to the military judge's query, the appellant expressly stated he waived any challenge for cause against Capt EW and MSgt SG and specifically confirmed he had discussed the issue with counsel. We will not permit the appellant to benefit from invited error. *United States v. Catt,* 1 M.J. 41, 47 (C.M.A. 1975) (citing *United States v. Airhart,* 48 C.M.R. 685 (1974) ("Where the defense, armed with full knowledge of its right to make objection or challenge, deliberately and consciously declines to do so and expressly waives that right, we have consistently declined to ... permit the defense to induce the error and then take advantage of it on appeal.")).

■ The appellant next argues his trial defense counsel were unable to lay a proper foundation for telephone records that would have apparently shown SF called the appel-

---

**5.** Captain EW said she had filled in for the base Sexual Assault Response Coordinator (SARC) on one occasion, but she did not complete any victim advocate duties.

lant several times after the incident to counter her testimony that she did not call the appellant. In the ADC's post-trial affidavit, she stated she asked SF during cross-examination about the discrepancy between her testimony and the telephone logs in order to impeach her testimony but she never intended to have the documents admitted because doing so would have called attention to the location of SF's former boyfriend, a detrimental witness to the defense's case. Again, the defense counsel's rationale was reasonable and did not amount to ineffective assistance.

▇▇▇Additionally, the appellant contends defense counsel failed to argue mistake of fact as to consent during her closing argument. The appellant argues his counsel should have stressed to the members "once she pushed him off, he did not attempt to pursue anal sex again." As a consequence, the appellant contends "defense counsel failed to make one of the most basic and primary arguments that lead to an acquittal in this type of sexual assault case." We find the appellant's argument is without merit. In her summation, defense counsel thoroughly discussed the evidence and put forward the argument that SF's actions and failure to voice her disagreement over what was taking place would have led to the honest and reasonable belief that she had consented to the oral and anal sex. Furthermore, the military judged properly instructed the members on the possibility of a mistake of fact defense. Court members are presumed to follow the military judge's instructions. *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F.2000).

▇▇▇ Next, the appellant argues his defense counsel failed to introduce evidence during the sentencing proceedings that he would be required to register as a sex offender. The ADC logically explained in her affidavit that she did not want to concentrate on this issue because, "Restrictions for sex offenders are favorable to most Americans as they are viewed as a means of protecting society. Very little if any sympathy is drawn from a sex offender having a specific restriction." Instead, counsel chose to focus on the appellant's low risk for recidivism and used a defense psychologist to present the informa-

tion to the members. Additionally, the issue was not raised through the appellant's unsworn testimony because he was very upset with the members' findings and refused to make an oral statement and could only be convinced to submit a previously written statement that did not discuss sex offender registry impact. Given the fact that the appellant's sentence did not include confinement, it is quite apparent trial defense counsel argued the points in mitigation very well. Her rationale for not wanting to highlight the sex offender registry was reasonable.

### *Sexual Offender Registration*

▇▇▇ In his second issue, the appellant claims the military judge abused his discretion by not permitting the trial defense counsel to discuss the impact of sex offender registry during sentencing. During presentencing, trial counsel made a motion in limine, asking the judge to prohibit trial defense counsel from discussing the effects of sex offender registration. The SDC argued that all states have some form of sex offender registry and such an outcome was a reasonable inference from the appellant's conviction. The military judge ruled sex offender registration was a collateral matter and went to facts not in evidence before the court.

"We review a military judge's decision whether to instruct on a specific collateral consequence of a sentence for abuse of discretion." *United States v. Boyd*, 55 M.J. 217, 220 (C.A.A.F.2001) (citing *United States v. Perry*, 48 M.J. 197, 199 (C.A.A.F.1998)). The abuse of discretion standard is strict and involves "more than a mere difference of opinion." *United States v. McElhaney*, 54 M.J. 120, 132 (C.A.A.F.2000). The challenged action "must be 'arbitrary, fanciful, clearly unreasonable' or 'clearly erroneous.' " *Id.* (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F.1997); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A.1987)). As a general proposition, collateral consequences of a particular sentence are not relevant to a court-martial proceeding. *United States v. Quesinberry*, 31 C.M.R. 195, 198 (C.M.A. 1962) ("In sum, the rule which is applicable here is simply that precept which commands courts-martial to concern themselves with

the appropriateness of a particular sentence for an accused and his offense, without regard to the collateral administrative effects of the penalty under consideration.").

While our superior court has to some degree relaxed the general rule to permit discussion of collateral impact in cases involving retirement benefits, to date the court has not made such a policy change with respect to sex offender registration, and we decline to do so today. *See Boyd*, 55 M.J. at 221. Retirement benefits are defined and quantifiable and can be explained to the sentencing authority with specific accuracy. The requirements for registering as a sex offender on the other hand are not nearly as precise. Each state has different rules as to when registration is required and how compliance is monitored and measured. Given these differences, the military judge did not abuse his discretion by finding there was insufficient information for the members to make an informed decision on the issue. While the effects of registration may be difficult for the appellant, the military judge did not abuse his discretion by precluding trial defense counsel from discussing the matter during argument.

### Improper Convening Authority Action

The appellant was sentenced to a dishonorable discharge, forfeiture of all pay and allowances and reduction to the grade of E–1. The convening authority approved the sentence as adjudged. The appellant asserts the convening authority's action violated R.C.M. 1107(d)(2). Specifically, the Discussion to R.C.M. 1107(d)(2) states, "When an accused is not serving confinement, the accused should not be deprived of more than two-thirds pay for any month as a result of one or more sentences by court-martial and other stoppages or involuntary deductions, unless requested by the accused." The government counsel concedes that by application of the Discussion in R.C.M. 1107(d)(2), and the holding in *United States v. Warner*, 25 M.J. 64 (C.M.A.1987), forfeiture should have been limited to two-thirds of the appellant's pay. We agree. We find the approved sentence materially prejudiced the substantial rights of the appellant because it exceeds the maximum authorized. *See* Article 59(a), UCMJ, 10 U.S.C. § 859(a).

We now analyze the case to determine whether we can reassess the sentence. *United States v. Doss*, 57 M.J. 182, 185 (C.A.A.F.2002). Before reassessing a sentence, this Court must be confident "that, absent any error, the sentence adjudged would have been of at least a certain severity." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A.1986). A "dramatic change in the 'penalty landscape'" gravitates away from our ability to reassess a sentence. *United States v. Riley*, 58 M.J. 305, 312 (C.A.A.F. 2003). Ultimately, a sentence can be reassessed only if we "confidently can discern the extent of the error's effect on the sentencing authority's decision." *United States v. Reed*, 33 M.J. 98, 99 (C.M.A.1991). In *United States v. Harris*, 53 M.J. 86, 88 (C.A.A.F. 2000), our superior court decided that if the appellate court "cannot determine that the sentence would have been at least of a certain magnitude," it must order a rehearing. *See also United States v. Poole*, 26 M.J. 272, 274 (C.M.A.1988).

Although the approved forfeitures exceed the maximum punishment authorized, we are confident the convening authority would have approved a punishment which includes a forfeiture of two-thirds of his pay per month from the time the sentence was adjudged until he took action on this case. Considering the evidence in the record, we find that a reassessed sentence of a dishonorable discharge, forfeiture of $933.00 pay per month for two months and reduction to the grade of E–1 cures the error. We also find, after considering the appellant's character, the nature and seriousness of the offense, and the entire record, that the reassessed sentence is appropriate.

### Sentence Severity

Finally, the appellant argues a dishonorable discharge is too severe given the members sentenced him to no confinement. We review sentence appropriateness de novo. *United States v. Baier*, 60 M.J. 382, 383–84 (C.A.A.F.2005). We make such determinations in light of the character of the offender, the nature and seriousness of his offenses, and the entire record of trial. *United States*

*v. Snelling*, 14 M.J. 267, 268 (C.M.A.1982). Additionally, while we have a great deal of discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F.1999); *United States v. Healy*, 26 M.J. 394, 395–96 (C.M.A.1988).

■ The appellant was convicted of orally and anally sodomizing a non-consenting victim, offenses considered amongst the most serious crimes recognized by society.[6] We have given individualized consideration to this particular appellant, the nature and seriousness of the offenses, the appellant's record of service, and all other matters contained in the record of trial. The approved sentence was clearly within the discretion of the convening authority and was appropriate in this case. Accordingly, we hold that the approved sentence is not inappropriately severe.

### Appellate Delay

As this Court was finalizing its separate opinions in this case, the appellant filed a motion asserting that the delay in his case is unreasonable. We agree. The overall delay of more than 540 days between the time the case was docketed at the Air Force Court of Criminal Appeals and completion of review by this Court is facially unreasonable. Because the delay is facially unreasonable, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice. *See United States v. Moreno*, 63 M.J. 129, 135–36 (C.A.A.F.2006). When we assume error, but are able to directly conclude that any error was harmless beyond a reasonable doubt, we do not need to engage in a separate analysis of each factor. *United States v. Allison*, 63 M.J. 365, 370 (C.A.A.F.2006). This approach is appropriate in the appellant's case. Having considered the totality of the circum-

stances and the entire record, we conclude that any denial of the appellant's right to speedy post-trial review and appeal was harmless beyond a reasonable doubt.[7]

### Conclusion

We affirm the findings and only so much of the sentence as provides for a dishonorable discharge, forfeiture of $933.00 of his pay for two months and reduction to E–1. The approved findings and the sentence, as modified, are correct in law and fact and no error prejudicial to the substantial rights of the appellant occurred. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F.2000). Accordingly, the findings and sentence, as modified, are

AFFIRMED.

ROAN, Judge, dissenting:

Even affording trial defense counsel the "strong presumption that [their] conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, under the facts of this case, their failure to procure the services of an expert in sexual assault examinations amounted to ineffective assistance that prejudiced the appellant's case. I therefore dissent from the majority opinion.

In preparing a defense, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052. *See also United States v. Sales*, 56 M.J. 255, 258 (C.A.A.F.2002); *United States v. Hammer*, 60 M.J. 810, 820 (*f rev*) (A.F.Ct.Crim.App. 2004) ("Defense counsel ... have an ethical obligation to properly investigate the charges against their client in formulating trial strategy."); *Richter v. Hickman*, 578 F.3d 944, 946 (9th Cir.2009) ("At the heart of an effective defense is an adequate investigation. Without sufficient investigation, a defense attorney, no matter how intelligent or persuasive in court, renders deficient performance and jeopardizes his client's defense."); *Jennings*

6. The maximum sentence for forcible sodomy is confinement for life.

7. We note this Court approved seven requests from the appellant for an enlargement of time in this case. Additionally, we approved the appellant's request for oral argument.

*v. Woodford,* 290 F.3d 1006, 1014 (9th Cir. 2002) (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052) ("[A]ttorneys have considerable latitude to make strategic decisions about what investigations to conduct *once they have gathered sufficient evidence upon which to base their tactical choices."*). A counsel's failure to conduct sufficient investigation may violate the appellant's Sixth Amendment rights. *United States v. Scott,* 24 M.J. 186, 192–93 (C.M.A.1987) (failure to investigate alibi defense and prepare for trial was ineffective); *Holsomback v. White,* 133 F.3d 1382, 1387–89 (11th Cir.1998) (holding that failure to conduct adequate investigation into medical evidence of sexual abuse was ineffective).

Based on trial defense counsels' deficient pretrial investigation, I disagree with my colleagues' conclusion that the decision to withdraw the request for an expert in exchange for limiting TB's testimony was a legitimate trial strategy based on sound tactical reasoning. The defense team readily admitted in their motion to compel that they lacked expertise in evaluating sexual assault evidence, saying appointment of an expert consultant was:

> [A] *necessity* in Defense preparation of this case. No member of the Defense team has received formal or informal training regarding forensic evidence collection from a complainant after an allegation of sexual assault. Defense consultant will be utilized to *confirm the accuracy of the findings* of Government's SANE. Furthermore, said consultant will assist in identification and development of any favorable evidence that can be derived from the SANE report. Finally, if determined necessary, the consultant may assist as a witness *to explain* said favorable evidence to the court. Absent the appointment of such an expert, the Defense will be *at a disadvantage* to discover and explain favorable evidence derived from the SANE report.... *There is a reasonable probability that not ordering the appointment of such an expert would result in a fundamentally unfair trial.* By depriving [the appellant] the opportunity *to effectively challenge* the Government's case because his counsel are not experts in the fields of Sexual Assault

Examinations, would violate his due process rights."

(Emphasis added). Unfortunately, counsels' judgments about the detrimental effects of not having an expert to guide them through unfamiliar terrain proved exceedingly accurate.

Despite their expressed concerns, trial defense counsel chose to forego the opportunity to secure an expert based on an assumption that TB's testimony would not be harmful to the case. It is entirely unclear from the record on what basis they made such a conclusion. When exactly did it no longer become a "necessity" to have expert assistance during defense preparation of the case? In what way did counsel suddenly become knowledgeable in evaluating sexual assault reports and understanding the conclusions of experts who deal in a highly specialized area, when shortly before they told the military judge that failure to appoint an expert would result in a fundamentally unfair trial? How were they capable of "confirm[ing] the accuracy of the findings of Government's SANE?" How did they abruptly overcome their stated disadvantage to identify and develop favorable evidence from the SANE report without expert assistance? More telling, how were they suddenly able to "effectively challenge the Government's case" when they had received no formal or informal training regarding forensic evidence collection and analysis in sexual assault allegations?

Relying on nothing more than their admittedly uneducated gut-feeling and without so much as a single consultation with a sexual assault expert to substantiate their pre-trial opinion that TB's testimony would be innocuous, counsel chose to withdraw the motion to compel. Under these circumstances, counsels' decision cannot be justified as a legitimate trial strategy. *See United States v. Gray,* 878 F.2d 702, 711 (3d Cir.1989) ("[C]ounsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when [he] has not yet obtained the facts on which such a decision could be made."); Beth A. Townsend, *Defending the "Indefensible": A Primer to De-*

*fending Allegations of Child Abuse*, 45 A.F.L.REV. 261, 270 (1998) ("It is difficult to imagine a child abuse case ... where the defense would not be aided by the assistance of an expert."). *See generally United States v. Tornowski*, 29 M.J. 578, 580 (1989) ("There is little question that child sexual abuse cases often present a fertile, indeed, a necessary, area for expert assistance."); *Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir.2001) ("Defense counsel's failure to consult an expert, failure to conduct any relevant research, and failure even to request copies of the underlying studies ... contributed significantly to his ineffectiveness.").

While the majority is correct that defense counsel is not required to obtain an expert merely because the government has done so, the defense counsel's failure in this regard is perplexing. The government's direct evidence concerning the forcible anal sodomy charge consisted of SF's allegations and TB's testimony regarding her observations and personal opinion as to the cause of the injuries. Counsel certainly must have realized that TB's conclusions were critical to the government's case. TB provided the only effective corroboration of SF's version of events. While it should have been obvious to the defense that a key prong of their strategy had to focus on diminishing the impact of TB's testimony by discrediting her credentials and/or calling into question the legitimacy of her findings and conclusions, the record shows that did not occur. Furthermore, defense counsels' explanation for not wanting to delay the case in order to prevent the prosecution from having additional time to find the two unfavorable witnesses fell flat when the military judge granted the government a two-month delay. At that point, any tactical reason not to seek expert assistance during the break in time was negated.[8]

Even accepting for the sake of argument that trial defense counsels' decision to withdraw their motion to compel was plausibly reasonable, their failure to renew the request for an expert once TB's testimony substantially changed from what they expected is indefensible. "Guessing wrong does not usually amount to incompetent representation. But being unprepared for the consequences of a wrong guess, when the issue is critical to the defendant's case, may well amount to ineffective performance." *Richter v. Hickman*, 578 F.3d 944, 957 n. 10 (9th Cir.2009). Such is the case here.

This is not a matter of second-guessing from the judicial replay booth. Both counsel readily admit they were caught off-guard by TB's testimony. The SDC's post trial affidavit stated:

> When [TB] took the stand to testify, she described her findings as to anal trauma in surprisingly more provocative and aggressive ways than she had during our interviews. Her testimony at trial regarding the anal examination was more in line with how she had previously spoken to us about the vaginal trauma. *Had she initially relayed this information to us in our previous interviews, we would not have waived our motion to compel [BO].*

(Emphasis added). Likewise, in a post-trial affidavit, the ADC stated:

> At trial, it appeared as though after learning [TB] would be prohibited from discussing the vaginal exam, she transferred her opinions regarding the extant and source of the damage from one part of the body to the other. [TB's] comment, '... that you would not usually see any lacerations from consensual sodomy because that particular sexual act is for pleasure and not for pain ...' was a drastically different position that [sic] previously provided in Defense

8. In his affidavit, the SDC states that BO, the post-trial SANE for the defense, would not have been available when the trial resumed. He explained his reasoning for not seeking a substitute expert: "Although we could have opted for a different SANE consultant, neither [the ADC] nor I were familiar with any other local SANEs and as a result, we would have risked replacing [BO] with a less capable SANE.... Voluntarily substituting [BO] for a SANE of unknown competence would have constituted an unacceptable risk." I do not understand counsel's logic that it was more beneficial to the defense to proceed to trial without expert assistance than to request a consultant who, at a minimum, would have had qualifications equal to TB's. *See United States v. Warner*, 62 M.J. 114, 119 (C.A.A.F.2005) (defense is entitled to an expert whose qualifications are "reasonably similar" to the government's expert).

interviews and at the Article 32[, UCMJ,] hearing.

Despite their surprise, when the need for expert advice regarding how to constructively challenge TB should have been abundantly clear, defense counsel did not take appropriate and reasonable steps mid-trial to remedy their error. Instead, counsel plunged ahead ineffectively trying to shake TB's testimony, findings, and conclusions. Merely trying to cross-examine an expert on matters defense counsel acknowledge they were not conversant in (and could not be prepared for given they thought the expert was going to testify differently), cannot be considered effective assistance. *Knott v. Mabry*, 671 F.2d 1208, 1212–13 (8th Cir.1982) (noting that counsel may be found to be ineffective for failing to consult an expert where "there is substantial contradiction in a given area of expertise," or where counsel is not sufficiently "versed in a technical subject matter ... to conduct effective cross-examination."); *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir.2005) ("In sexual abuse cases, because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel.").

The majority correctly notes that the appellant must show more than his counsels' faulty performance. He must also demonstrate he was prejudiced to the extent "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. While the appellant bears the burden of showing prejudice, "[i]t is clear, however, that [the appellant] *need not* show that [counsel's] deficient conduct more likely than not altered the outcome in the case. This 'preponderance' standard was explicitly rejected in *Strickland." Sanders v. Ratelle*, 21 F.3d 1446, 1461 (9th Cir.1994) (citing *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052).

Contrary to the majority opinion, I find defense counsels' errors to be highly prejudicial and seriously call into question the validity of the appellant's court-martial conviction. We do not have to guess whether trial defense counsels' miscues adversely impacted the appellant's case; their own statements and actions are proof enough. The SDC admitted, "Had she initially relayed this information to us in our previous interviews, we would not have waived our motion to compel [BO]." Counsel effectively acknowledges he was unprepared to confront TB when she provided evidence different than was expected. This problem would not have occurred if he had, at a minimum, renewed his motion to compel the appointment of an expert following TB's testimony.

Following trial, the ADC, apparently recognizing the damage caused by not securing a consultant, advised the appellant to hire BO, a registered SANE nurse and previously recognized court expert in sexual assault examinations (in fact, she was the same expert the defense had previously asked the convening authority to appoint), to review the record of trial, specifically with respect to TB's testimony, findings and opinions. BO issued a highly critical report, calling into question TB's experience, methodology, and conclusions on a number of crucial points; areas the defense counsel did not sufficiently address during TB's cross-examination. BO criticized at least six aspects of TB's performance, as follows:

First, BO disagreed with TB's claim that the pictures taken during SF's examination showed SF's anus as "dilated" and "open" as the result of damage and trauma. BO claims the pictures appeared to be that of a "normal anus that is closed," contradicting TB's testimony that the anus was damaged in a manner that left it open over 24 hours after the incident. Her potential testimony would have been critical to whether SF actually incurred the trauma that TB claims she observed.

Second, BO disputed the method TB used to test SF's sphincter, claiming that having a person lying on their back with knees pulled to their chest, as TB testified, would not give accurate results. She also claimed TB's technique for determining anal function through manual stimulation was flawed.

Third, BO challenged TB's claim that SF's colon was visible in one of the photographs.

BO asserts that in fact the picture shows SF's anus was tightly closed, making it impossible to see her colon. Likewise, TB claimed she observed the pectinate line of the anus in the pictures. BO states the pectinate line is much lower in the anus than the colon and therefore it was not visible. BO's testimony would have cast TB's understanding of basic physiology into doubt, potentially leading the members to discount her testimony altogether.

Fourth, BO questioned TB's assertion that she had observed and interviewed emergency room patients concerning injuries resulting from anal sex. BO states that talking to patients about anal sex is not common practice in the emergency room regardless of what the patient was presenting for, so it is particularly unlikely that TB was regularly asking such questions, again raising doubt as to reliability of TB's testimony.

Fifth, BO claimed that, had she been employed at trial, she would have requested the literature, research, and educational materials that TB used to support her observations concerning consensual and non-consensual anal sex. BO contends this topic is not well researched.

Sixth, BO disputed TB's opinions regarding consensual sodomy. TB testified that she would not expect to see lacerations from consensual sodomy, "because that particular sexual act is for pleasure, not for pain and when it's done in a controlled environment with ... willing part[ies] ... it doesn't usually have injury with it." TB further stated that "Two people who are experienced with anal sex normally don't incur injury." BO claimed the injuries could have occurred during consensual or non-consensual sex, explaining that "even two people who are experienced in anal sex could incur injury due to the sensitivity of the anus and the fact that it is not meant to be entered."

Additionally, in a post-trial memorandum to the convening authority, the ADC made the following personal comments regarding TB's testimony:

1. "[TB] misrepresented her experience level in examinations of persons after sexual encounters."

2. "[TB] over stepped the boundaries of her knowledge when she attempted to distinguish the appearance of the body after consensual anal intercourse verses forced anal intercourse."

3. "[TB's] testimony regarding [SF's] anal trauma is inaccurate."

4. "[TB] is a biased witness."

Unfortunately, BO's opinions and the ADC's concerns were made after the appellant's was already convicted. These important points would have been much more effective if made during the trial itself.

In my opinion, trial defense counsels' errors were clearly prejudicial. BO's report and a thorough reading of the record of trial show that defense counsel did not adequately question the methods TB used to conduct her exam, confront her with other studies, or refer to pertinent medical literature to question the accuracy of her conclusions. The defense counsels' lack of familiarity with the medical issues involving sexual assaults effectively assured that TB's almost uncontroverted testimony was given greater weight by the members.

The majority asserts that, had BO testified consistent with her report, the final result would not have been different. I do not agree. The majority's conclusion does not take into account the influential impact that expert testimony can have upon the fact finder. *Pavel v. Hollins*, 261 F.3d 210, 224 (2d Cir.2001) (quoting *Swofford v. Dobucki*, 137 F.3d 442 (7th Cir.1998) ("Indeed, 'many' sex abuse cases are 'close ... on the evidence,' and when a case hinges all-but-entirely on whom to believe, an expert's interpretation of relevant physical evidence (or the lack of it) is the sort of 'neutral, disinterested' testimony that may well tip the scales and sway the fact-finder") (internal citations omitted)); *Williams v. Washington*, 59 F.3d 673, 681–82 (7th Cir.1995) (citing *Montgomery v. Petersen*, 846 F.2d 407, 413–14 (7th Cir.1988) ("[I]n a credibility contest, the testimony of neutral, disinterested witnesses is exceedingly important")). Had BO testified, the members would have been presented with evidence from two expert witnesses each of whom would have contradicted key pieces of

the theory presented by the opposing side. Such a situation "would have presented a classic battle of the experts, [and] the potential damage to the side whose expert is missing can be devastating." *United States v. Clark*, 49 M.J. 98, 101 (C.A.A.F.1998). *See also Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir.1999) ("The jury did not, however, have the benefit of expert testimony to explain the ramifications of these experiences on [the appellant's] behavior. Expert evidence is necessary on such issues when lay people are unable to make a reasoned judgment alone.").

BO's assistance in formulating an effective defense strategy would have been invaluable. She could have provided defense counsel with the means to contest TB's ultimate conclusion that the injuries were consistent with forcible penetration. TB's testimony on this point was particularly damaging to the defense. Because her opinion was not effectively challenged, TB conveyed the message that SF's injuries could only be the result of nonconsensual forcible sodomy. The defense's attempt at cross-examination as the primary means to damage TB's credibility was not a substitute for the affirmative evidence that BO ostensibly could have provided to diminish the impact of TB's testimony.

Moreover, BO's credentials as an expert were far better than TB's. BO had testified as an expert in sexual assault examinations in hundreds of trials. TB's experience on the other hand was far less. In fact, the appellant's case was the first time she had been recognized as an expert by any court. It is very possible, indeed likely, that the members would have given BO's opinions greater weight than TB's simply because her demonstrated expertise in evaluating the central issue of forcible penetration and sexual assaults in general was significantly more compelling.

In sum, trial defense counsels' failure to secure a forensic expert constituted an abrogation of their responsibility that undermined the proper functioning of the adversarial process. Despite the critical nature of TB's testimony, counsel failed to consult with a forensic expert and thus failed to conduct the rudimentary investigation necessary to decide upon the nature of the defense to be presented; determine before trial what evidence should be offered; prepare in advance how to counter damaging expert testimony that would be introduced by the government; and effectively cross-examine and rebut the government's expert witness once she testified. The traditional deference owed to the tactical and strategic judgments of counsel is not justified where there was not an adequate investigation supporting those judgments. *Wiggins v. Smith*, 539 U.S. 510, 522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ("Counsel's failure to uncover and present mitigating evidence at sentencing could not be justified as a tactical decision ... because counsel had not fulfill[ed his] obligation to conduct a thorough investigation of the defendant's background.")); *Strickland*, 466 U.S. at 696, 104 S.Ct. 2052 ("A verdict or conclusion only weakly supported by the record is more likely to have been affected by counsel's errors.").

The issue at this point is not whether BO's opinions and criticisms were necessarily correct or would have ultimately led the members to discount TB's testimony. Rather, the question is whether the appellant has met the threshold burden of demonstrating that his counsels' performance fell outside the acceptable range of professionally competent assistance and that, but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different. In my opinion, the answer is clear that both prongs have been met and counsels' defective assistance undermines the confidence in the appellant's conviction.

I would therefore set aside the appellant's conviction on all charges and specifications.

ROAN, Judge, filed a dissenting opinion.