# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40257**

————————————

**UNITED STATES**
*Appellee*

v.

**Devin W. JOHNSON**
Specialist 3 (E-3), U.S. Space Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 9 August 2023

————————————

*Military Judge*: Charles G. Warren.

*Sentence*: Sentence adjudged 30 October 2021 by GCM convened at Schriever Space Force Base, Colorado. Sentence entered by military judge on 20 January 2022: Bad-conduct discharge, confinement for 6 months, reduction to E-1, and reprimand.

*For Appellant*: Major Spencer R. Nelson, USAF; William E. Cassara, Esquire.

*For Appellee*: Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Lieutenant Colonel G. Matt Osborn, USAF; Major John P. Patera, USAF; Captain Olivia B. Hoff, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, ANNEXSTAD, and GRUEN, *Appellate Military Judges*.

Senior Judge ANNEXSTAD delivered the opinion of the court, in which Chief Judge JOHNSON and Judge GRUEN joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

ANNEXSTAD, Senior Judge:

At a general court-martial, a panel of officer members convicted Appellant, contrary to his pleas, of one specification of abusive sexual contact (Specification 1 of the Charge), in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1, 2] A military judge sentenced Appellant to a bad-conduct discharge, confinement for six months, reduction to the grade of E-1, and a reprimand. The convening authority took no action on the findings or sentence.

Appellant raises seven issues which we have reordered and reworded: (1) whether Appellant's conviction is legally and factually sufficient; (2) whether Appellant was convicted of an offense which he was not on notice of or charged with; (3) whether the military judge violated the canon against surplusage and Appellant's due process rights by allowing the Government to argue a different theory of liability than charged; (4) whether Appellant's conviction is ambiguous; (5) whether the military judge erred by admitting a victim impact statement; (6) whether Appellant's sentence is inappropriately severe; and (7) whether Appellant's reprimand contained error.[3]

With respect to issues (4) and (7), we have carefully considered Appellant's contentions and find they do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).[4] We consolidate and consider issues (2) and (3) together. Finding no error that materially prejudiced a substantial right of Appellant, we affirm the findings and sentence.

---

[1] All references to the UCMJ are to the *Manual for Courts-Martial, United States* (2019 ed.).

[2] Appellant was acquitted of one specification of abusive sexual contact (Specification 2 of the Charge) and one specification of sexual assault (Specification 3 of the Charge) in violation of Article 120, UCMJ.

[3] Issues (6) and (7) were raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] Regarding issue (7), we find that the military judge erred when he *sua sponte* changed the convening authority's language in the reprimand in the entry of judgment. Specifically, the military judge changed the convening authority's reference to "sexual assault" in the language of the reprimand to "abusive sexual contact," based on the specific offense for which Appellant was convicted. Rule for Courts-Martial 1003(b)(1) provides "[a] court-martial shall not specify the terms or wording of a reprimand. A reprimand if approved, shall be issued, in writing, by the convening authority." The Discussion also makes clear that "[o]nly the convening authority may specify the terms of the reprimand." Having found error, we have reviewed for material prejudice to a substantial right of Appellant and find none.

## I. BACKGROUND[5]

GH joined the Space Force in February 2020. Following basic training, she attended technical training at Vandenberg Space Force Base (SFB) in California. There GH met Appellant for the first time. The two had limited interaction as they were not in the same class. On one occasion, Appellant told GH that she was "hot and nice to look at." GH thought the comment was inappropriate and reported it to her military training leadership. Appellant later apologized.

In August 2020, GH finished technical training and arrived at her first duty station, Schriever SFB, Colorado. About three weeks later, she ran into Appellant at the base computer lab. Appellant again apologized for his earlier comment, and she accepted his apology. She then stated that Appellant offered to help her get settled and volunteered to help her find a dining table, since her household goods would not arrive for a few weeks. She accepted. That night Appellant picked her up from her apartment, the two had dinner, and then went shopping for a table. GH found a table she liked but did not purchase it because it was too expensive. Appellant then offered to buy the table for her, but she declined his offer.

A couple of days later, on 18 September 2020, GH and a friend, Specialist (Spc) TL, were in the base computer lab discussing dinner plans. Spc TL told GH that she had to cancel their dinner plans because her kids were sick. Appellant apparently overheard the conversation and offered to cook GH dinner at her apartment. GH felt Appellant was just being nice, but made sure to tell Appellant her acceptance was just "as friends." When Appellant arrived at her apartment around 1900 hours, he brought a rice cooker and food to make dinner. GH did not hug or touch him at all when he arrived. Appellant started cooking rice and fish while they talked about GH receiving a box of clothes. The two then decided to go to a store while the dinner was cooking to get cookies for dessert.

While at the store, Appellant bought cookie dough and a 12-pack of Mike's Hard Lemonade. GH informed Appellant she would not permit him to "get[ ] drunk" and stay at her apartment. She also told him she did not want to have to drive him back to the dormitory. GH explained, "I did not want him thinking that he would be able to just crash at my place if he would get drunk." She did not plan on drinking that night because "[she] didn't want to drink with him around. [She] didn't want to drink by [her]self either, and [she] didn't know him that well, so [she] didn't want anything to come of that." According to GH, they also purchased menstrual pads at the store.

---

[5] Unless otherwise noted, the facts that follow are derived from GH's testimony.

When they arrived back at the apartment, Appellant finished cooking dinner while GH prepared to bake the cookies. She testified that when she bent over to put the cookies in the oven, she "felt a brush against [her] butt." She was unsure if it was a hand or just Appellant walking by, "but to be on the safe side [she] told him that he needed to watch himself." Appellant apologized to her and stated, "I'm sorry. This is a small kitchen. I was walking by and I did not mean to." GH did not know if it was intentional or unintentional.

GH and Appellant ate dinner on an air mattress because GH had turned on a movie on her laptop plugged in nearby. After they finished eating, GH took the cookies out of the oven and they continued watching the movie. Appellant had begun drinking his second drink. Appellant was on GH's left side on the air mattress. She said there was space between the two and they were not touching. After dinner, GH expected she and Appellant would finish watching the movie, and he would go home.

GH fell asleep around 2100. She had been up since 0500 and was tired but did not intend to fall asleep. Before she fell asleep, no hugging, touching, cuddling, or kissing of any kind occurred between her and Appellant. The only physical touching was when Appellant touched her buttocks in the kitchen. While she was asleep, GH faintly remembers laying on her right side and her "left arm was being tugged." She rolled onto her back and "brought [her] hand over to what felt like [Appellant's] chest, and ended up falling back asleep."

Later, GH would be fully awoken. She explained:

> I was laying on my right side, half on my stomach, I guess. I had my arms under my pillow, and I had my right leg straight out and my left leg kind of bent up. I felt this pressure and like this heat on my back that was making me feel hot, and being on the air mattress was uncomfortable. So I initially woke up to move around and realized that I could not move around because I felt this weight on my backside. I felt his hand in my pants, in my underwear. I felt this fingering motion, and I felt this warmth that felt like a penis on my back right end.

GH described that Appellant's left hand was entering her underwear from the back of her pants, and that Appellant's fingers entered her vagina. GH also said she felt warmth and pressure on her body, adding, "It was on my right buttocks. My pants were slightly pulled down so that he would be able to have his hand inside of my pants." When asked if she felt Appellant's penis, GH said,

4

"Yes." When asked if she believed the warmth and pressure on her buttocks, torso, and upper thigh was from Appellant's penis, she replied, "Yes, sir."[6]

GH immediately got up and went to the bathroom. She realized her bra was unclasped in the back and her pants were unbuttoned. GH also realized her vagina was naturally lubricated, which, as she stated, confirmed to her what Appellant was doing—"feeling up on me in my sleep." GH became very upset, went into the living room, and turned on the light. GH said Appellant was laying on the air mattress "pretending" to sleep when she entered the room. She sternly asked him, "Why is my bra undone," to which Appellant replied, "I had undone your bra in your sleep. You were laying on my chest, and I was rubbing your back, and I thought that you would be okay with it."

At this point, GH also realized Appellant had no shirt on. She testified, "I told him that that was not okay with me. I was sleeping and that he shouldn't have just assumed that something like that was okay, and that he needed to get up, take his things[,] and get out." As Appellant got up and was gathering his things, GH could see that Appellant had an erection. When asked if she remained calm or ever had to elevate the tone of her voice, GH explained that she got very upset and told him to leave. She stated that she was crying and yelling and at one point, she told Appellant if he did not leave she would call the police. GH estimated about 20 minutes passed from when she initially confronted Appellant to when he actually left. Appellant took his alcohol with him but left the rice cooker.

Once Appellant was gone, GH cried for a bit and then called her longtime friend, Mr. JT, whom she had known since high school. She spoke with Mr. JT for about two hours and then decided to clean up, adding, "I felt gross and wanted to go take a shower." She eventually went to sleep around 0400 hours. When she woke up a few hours later, around 0700 or 0800 on Saturday morning, she called Staff Sergeant (SSgt) JT, her duty sponsor, and told him what happened the night before. SSgt JT then had the first sergeant call GH.

Later that morning, Appellant contacted GH. He apologized to GH for what happened and said he had "no reason to not believe" her when she said that it happened, but he did not think that he was "that type of person."

GH spoke with the Air Force Office of Special Investigations (AFOSI) that evening. At her apartment, AFOSI agents took pictures and gathered the shirt, jeans, bra, underwear, and menstrual pad she was wearing the night before. The menstrual pad collected from GH's apartment was sent to the United

---

[6] Appellant was acquitted of Specifications 2 and 3. Specification 2 alleged Appellant touched GH's torso, buttocks, and leg with his penis while GH was asleep. Specification 3 alleged Appellant penetrated GH's vulva with his finger while GH was asleep.

States Army Criminal Investigation Laboratory for testing. The results showed a low level of male DNA on the pad. Dr. DW, a forensic biologist, conducted DNA testing and testified that he was able to generate a partial profile "consistent with the profile that was obtained from [Appellant]." Dr. DW further testified that he compared the profile to a database to see how common or rare that profile was in the United States population and concluded the probability of obtaining the same partial profile at random in the United States was approximately 1 in 3,199. Dr. DW also stated the DNA profile found would be shared by Appellant and any of his paternal male relatives.

The next day, GH submitted to a medical forensic exam lasting about two hours. At trial, the nurse who performed the exam, Ms. MM, was recognized as an expert in the field of forensic nursing. She testified that during the examination GH told her she woke up with Appellant's hand in her underwear. This statement is contained in Ms. MM's report of the examination that was provided to Appellant prior to trial and admitted as Prosecution Exhibit 1 without objection.

Later that day, GH also conducted a pretext SnapChat conversation with Appellant. The SnapChat conversation was admitted as a prosecution exhibit during GH's testimony. GH testified that during the conversation Appellant never claimed he thought she was awake and participating. When asked specifically about consent on direct examination, GH denied consenting to Appellant touching her buttocks while in the kitchen, denied consenting to Appellant touching her buttocks or vagina, and denied consenting to Appellant "dry humping" her with his erect penis on her torso, buttocks, and leg on the air mattress. GH stated, "[O]ne, it was unwanted. I had stated that we were just friends. Two, I was sleeping. And three, it was just inappropriate. I don't see him that way."

AFOSI agents interviewed Appellant on 22 September 2020. The recorded interview was played for the members at trial. During the interview, Appellant stated that the two went shopping earlier in the afternoon, went to a liquor store, and ended up at GH's apartment to cook rice and fish. He also said they went to a local store to get cookies. Appellant explained they both were drinking and started watching the movie after they ate. Appellant also stated GH was wearing a sweatshirt and sweatpants, but then changed into "booty shorts" and a t-shirt when they started to watch the movie. Appellant confirmed GH said she was tired and went to sleep a little before him. Appellant then said that GH "rolled around [and] put her arm across me, and as I said, hand on my chest and that's when everything started."

During the interview, Appellant admitted to unhooking GH's bra and rubbing her back while GH was asleep. Appellant stated he rubbed her back for a little bit, kissed her on the top of her head, and said he then fell asleep.

Appellant told AFOSI agents that he regularly "gets hot" when he sleeps and stated, "I want to totally take my shirt off whenever I sleep." He added, "But I probably got hot while I was sleeping."

Appellant said he awoke when GH turned on the light and said he was groping and fingering her. Appellant stated, "I don't want to believe that it happened, but if it did happen, I wasn't really conscious. I wasn't there for it." He stated, "I was asleep, and I was really confused."

Later, however, Appellant began to discuss what happened between when he said he fell asleep and when GH woke him up:

> And that's one of the main reasons why I'm confused, and I don't want to say . . . "Yes, I fingered her, and my [penis] was out, and I was dry humping her, and like I unhooked her bra, and I was up on her and everything," I don't want to say that because it doesn't seem actually real to me, but I can also see it happening.
>
> . . . .
>
> I could see like me being like up against her being like half-asleep, half-awake kind of thing, like not really all there. And like putting my hand down her shorts or something, like grabbing her butt or something, I don't know. I could see it happen, but I like it just doesn't feel real to me.

Appellant later stated, "I still don't think that I was awake because I have a decent memory," and, "maybe I was awake like you said, but . . . I don't think I was fully awake, conscious, there mentally."

On the recorded interview, Appellant then closed his eyes as if trying to remember better what happened. Appellant then stated:

> I think I like hugged her maybe, or . . . just like wrapped my arm around her a little bit.
>
> . . . .
>
> So then I tried to get comfy again, and feel up to like to really fall back asleep. And I think I kind of did because I was asleep, and I was like up against her, and I think like maybe I was aroused a little bit because her behind was like close to my front.
>
> . . . .
>
> I don't really know, like I think at that point I was just like rubbing her leg for a little bit, and then I think I -- I touched her butt. And then sometime after that I could kind of see myself like -- oh, it's -- it's a terrible move, but a move that I know that I've pulled with significant others in the past. So like if you go

> into a little leg or butt massage or whatever, and then you like put your hand in their pants or whatever.
>
> . . . .
>
> I think after that I . . . put my hand down her shorts, and I don't know if I actually fingered her or not, but my hand was probably near there.
>
> . . . .
>
> I still don't think I fingered her, but I don't think that I'd be that coordinated, I guess is the word. But I think like I could kind of see myself put my hand down her pants, and just like kind of leaving it there.

Appellant said, "[I]t's not a one hundred percent for me in any means. I don't even know if it's 50 percent for me, but saying it out loud kind of felt real so . . . if that means anything." (Omission in original).

Appellant further stated, "I don't know if it's like my brain just doesn't want it to be real or something, and it's [sic] just like doesn't want it to be a legit memory, but it . . . seemed real." Appellant then said,

> I mean, it's a very short memory. . . . That may have just like [sic] a couple minutes at most. . . . I don't think I was trying to like perform any sort of like foreplay or something for a while. I think it was just kind of -- I don't want to say random, but spontaneous or something. I don't know, things just like happened. And then like I wasn't really like meaning much by it. And then I remember like cuddling up against her for a little bit more and then kind of just like falling back asleep completely. And then like that's when everything just kind of like went dark, and then I saw the light turn on, and her kind [of] push on my shoulder a little bit.

When asked to clarify whether he put his hands down her pants or both her pants and underwear, Appellant answered, "It was also her underwear because honestly, I don't if like -- I feel skin." Appellant further stated,

> I know for a fact that I was like squeezing her and I was like kind of like rubbing her butt a little bit. So since I was down there, like it seems like it could've happened to me that I was also rubbing her vagina. But I don't have like an exact like hundred percent feeling of it. But it makes sense to me. I'm like at like 80 percent right now.

When asked about touching GH in the kitchen while making cookies, Appellant said that he may have "booped" her butt, adding, "I don't know if it was like with my hand, or like a spatula, or like my knee, or -- I remember that though." He added, "I was just being like playful. I wasn't meaning anything by it. . . . I think I literally said 'boop.' You know, like you like boop someone's nose or something." Appellant said he did not grab her butt at this time, but "just poked it real quick."

Later, when asked again about placing his finger into GH's vagina, Appellant responded, "I don't actually remember it, but I mean, it's a possibility." Appellant further stated:

> I think I was just, probably just like subconsciously enjoying like cuddling with a woman and being near someone like that. I think like maybe I was just like kind of aroused and wanted to touch her butt or something. I'm not too sure.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant contends his conviction for abusive sexual contact is both legally and factually insufficient. We are not persuaded by Appellant's arguments and find no relief is warranted.

#### 1. Additional Background

During trial, the members heard testimony from three witnesses who talked to GH shortly after the night in question and heard her describe Appellant's conduct as wrongful. Mr. JT described the phone call he received from GH in the early morning hours of 18 September 2020. He testified she was "crying . . . hysterically" like he had "never heard her cry . . . before." According to Mr. JT, it took about "20 minutes" before GH "calmed down" enough to tell him what happened.

Mr. JT explained that GH told him she and Appellant had been hanging out, she fell asleep, and "woke up to pretty much having her bra unclasped and having her breasts touched and having a hand in her panties" and rubbing her vagina. When asked on cross-examination whether GH told him about Appellant touching her butt earlier in the night or rubbing his penis against her, Mr. JT responded, "Not to my knowledge." In response to a panel member question, however, Mr. JT explained that while he wanted to get full details from GH, "I'm guess[ing] she did not want to explain the whole thing at the moment since she probably was trying to keep calm to explain the key points of it."

When another panel member asked Mr. JT about GH's sleeping patterns, he responded,

> [I]t's very odd, but sometimes we'd go riding bike[s] or we'd be
> watching movies, and she's to that point of exhaustion and she
> is calm, like no more adrenaline from like bike riding, or is just
> tired, she would just fall asleep. Like there would be no warning
> to it. She would just be awake, you would look next to you, and
> she is already asleep.[7]

Appellant called as a witness SSgt JT who testified that GH told him in a phone call that she woke up with Appellant on top of her with his hand down in her underwear. SSgt JT recalled GH telling him Appellant was naked, she was wearing a shirt and underwear, and Appellant was rubbing his penis on her.

Appellant also called Spc TL who testified she knew both GH and Appellant from technical school. Spc TL said she and GH were friends from April 2020 until September 2020. Spc TL acknowledged GH called her on the morning after the incident. Spc TL stated GH sounded very scared and upset on the phone and GH told her that she was "freaked out." Spc TL testified GH told her:

> She said that she had invited him over, that he was going to
> make her dinner. She had had [sic] a drink, and they had
> watched a movie after they had finished eating, and then she . . .
> said she was going to go to bed, and that she had told him . . . he
> couldn't spend the night, but she left him where he was and she
> . . . went to sleep and that when she woke up in the middle of the
> night that he was . . . pressed up against her.

Spc TL further testified that GH told her she had run to the restroom when she woke up, yelled at Appellant, and told him to leave. Spc TL also testified GH did not mention Appellant fingered her or touching her butt. On cross-examination, however, Spc TL admitted her call with GH was interrupted because Spc TL was heading to the hospital for her daughter. When asked if she had an opinion on GH's character for untruthfulness, Spc TL said "she is untruthful." However, on cross-examination, Spc TL admitted their friendship had deteriorated after she confronted GH about how she behaved around men. Spc TL admitted she stopped being GH's friend after GH reported Spc TL's comment to her first sergeant.

Appellant also called another witness, Spc CR, who knew GH from technical school. Spc CR said they were together roughly ten hours a day during

---

[7] In Appellant's case-in-chief, the members heard an excerpt from GH's Air Force Office of Special Investigations interview in which she told agents she was "usually a light sleeper."

technical school and had approximately 40 to 50 conversations. Spc CR stated his opinion that GH is a "very untruthful person." On cross-examination, however, Spc CR admitted he had no contact with GH either before or after technical school and his knowledge of her was strictly based on their interaction at technical school. Spc CR also admitted that GH reported him for sexual harassment during technical school, and that affected his career.

**2. Law**

Issues of legal and factual sufficiency are reviewed de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "Our assessment of legal and factual sufficiency is limited to evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019). Indeed, in assessing legal sufficiency, the testimony of a single witness may satisfy the Government's burden to prove every element of a charged offense beyond a reasonable doubt. *United States v. Rodriguez-Rivera,* 63 M.J. 372, 383 (C.A.A.F. 2006). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses,' [this] court is 'convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying

'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). This court's review of the factual sufficiency is limited to the evidence admitted at trial. *See* Article 66(d), UCMJ, 10 U.S.C. § 866(d); *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted).

In order to find Appellant guilty of abusive sexual contact, in violation of Article 120, UCMJ, as alleged in Specification 1 of the Charge, the panel members were required to find the following two elements beyond a reasonable doubt: (1) Appellant did at or near Colorado Springs, Colorado, on or about 18 September 2020, commit sexual contact upon GH by touching her buttocks with his hand with the intent to gratify his sexual desire; and (2) Appellant did so without GH's consent. *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(4)(d).

Article 120(g)(2), UCMJ, states that sexual contact means:

> [The] touching, or causing another person to touch, either directly or through the clothing, the vulva, penis, scrotum, anus, groin, breast, inner thigh, or buttocks of any person, with the intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person. Touching may be accomplished by any part of the body or object.

10 U.S.C. § 920(g)(2).

Article 120(g)(7)(A), UCMJ, 10 U.S.C. § 920(g)(7)(A), explains consent as "a freely given agreement to the conduct at issue by a competent person." "A sleeping, unconscious, or incompetent person cannot consent." Article 120(g)(7)(B), UCMJ, 10 U.S.C. § 920(g)(7)(B). "All the surrounding circumstances are to be considered in determining whether a person gave consent." Article 120(g)(7)(C), UCMJ, 10 U.S.C. § 920(g)(7)(C).

**3. Analysis**

We have carefully reviewed the evidence at Appellant's court-martial and find it legally and factually sufficient to support his conviction for abusive sexual contact. The Government introduced convincing evidence of Appellant's guilt, most significant, the testimony of GH, who described how Appellant intentionally touched her buttocks with his hand, without her consent, and with the specific intent to gratify his sexual desire. According to GH, she awoke to find Appellant's "hand in [her] pants, in [her] underwear." She further stated that Appellant's hand was entering her underwear from the back of her pants.

GH's testimony was also supported by physical evidence showing a partial male DNA profile, consistent with Appellant, found on the menstrual pad GH wore at the time of the incident. Additionally, we note the members had the opportunity to view Appellant's interview with AFOSI, where Appellant discussed, more than a dozen times, his touching of GH's buttocks on the night in question. Specifically, Appellant stated, "I know for a fact that I was like squeezing her and I was like kind of like rubbing her butt a little bit."

GH also clearly testified she did not consent to Appellant's actions while she slept or otherwise convey any interest that she wished to engage in sexual activity with Appellant either immediately prior to or earlier on the night in question. In GH's words, "[T]hat was not okay with me. I was sleeping and . . . he shouldn't have just assumed that something like that was okay." GH further testified to circumstances showing Appellant had the intent to gratify his sexual desire, particularly that Appellant "had an erection" when she observed him shortly after waking up. Moreover, additional witnesses testified at the court-martial about how Appellant's conduct upset GH and caused her to promptly report it to others.

We find GH's testimony credible and sufficient, even without additional evidence, to support the charged offense. As an evidentiary standard, proof beyond a reasonable doubt does not require more than one witness to testify credibly. *See Rodriguez-Rivera,* 63 M.J. at 383. Nevertheless, in this case, Appellant's statements to AFOSI and the other witnesses' accounts corroborate important details of her version of events.

The crux of Appellant's argument at trial and on appeal is that his conviction is legally and factually insufficient because GH is not credible. Our review of the entire record, including any inconsistencies, indicates sufficient evidence to support GH's testimony. We are not persuaded any inconsistencies are more than minor or equate to reasonable doubt, especially when we factor in Appellant's inculpatory statements to law enforcement.

Viewing the evidence produced at trial in the light most favorable to the Government, a rational trier of fact could have found the essential elements of abusive sexual contact beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297−98. Furthermore, after weighing all the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt. *See Reed*, 54 M.J. at 41 (quoting *Turner*, 25 M.J. at 325).

**B. Notice and Due Process**

Appellant next argues his Fifth Amendment[8] due process rights were violated because he was convicted on an uncharged theory of abusive sexual contact. He alleges the Government engaged in a "bait and switch" that deprived him of his right to a fair trial. In Appellant's view, the charged offense related only to the incident in the kitchen in which Appellant touched GH's buttocks as she was putting cookies in the oven. According to Appellant, "To the extent that the guilty finding was the result of members applying the elements to the conduct on the air mattress, [Appellant] was convicted of an offense of which he was never charged."

In addition, Appellant argues the military judge violated the canon against surplusage and Appellant's due process rights by allowing the Government to argue a different theory of liability than charged. Specifically, Appellant asserts this error could have led the court members to improperly find him guilty of sexual contact with GH while she was incapable of consent because she was asleep, instead of finding that Appellant acted without GH's consent as the specification alleged. We are not persuaded by Appellant's arguments and find no relief is warranted.

**1. Additional Background**

On 5 April 2021, one charge and three specifications were preferred against Appellant. Specification 1 of the Charge, which is the only convicted offense, alleged Appellant "did, at or near Colorado Springs, Colorado, on or about 18 September 2020, touch [GH's] buttocks with his hand, with an intent to gratify his sexual desire, without her consent." Appellant did not request a bill of particulars to obtain more specific details about the conduct supporting this or any other specification.

At the start of Appellant's court-martial, trial counsel began his opening statement by quoting Appellant's admission to AFOSI that he touched GH's buttocks on the air mattress. Trial counsel quoted Appellant as saying, "It's a terrible move, but it's a move that I know that I have pulled with significant others in the past, where like you get like a little bit of a leg or a butt massage, or whatever, and then like you put your hand in their pants." Trial counsel later stated, "The next thing [GH] is . . . waking up to the [Appellant]'s hand in her pants. She could feel him rubbing her buttocks, leg and thigh." Trial counsel's opening statement never mentioned the touching incident in the kitchen.

---

[8] U.S. CONST. amend. V.

GH, during her testimony, stated that Appellant's arm and hand were down the back of her pants when she woke up, adding, "He used his left hand to go into the back of my pants and into my underwear." After receiving findings instructions, a panel member asked whether Specification 1 of the Charge included only the event in the kitchen or all the conduct that evening. During an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session, outside the presence of the members, trial counsel responded:

> I believe that it could reasonably apply to both instances per se. If they don't find an intent for the touching at the oven, that they should consider the touching on the air mattress. But . . . the gist of the [G]overnment's argument and our theory is that that primarily refers to the conduct on the air mattress.
>
> . . . .
>
> Government's [closing] argument will . . . suggest the possibility that they could find him guilty of . . . either conduct.

Appellant's trial defense counsel made no objection on a lack of notice or due process basis. Appellant's trial defense counsel also never stated they were not prepared to defend against Appellant touching GH's buttocks on the air mattress without consent. Instead, Appellant's counsel only questioned whether it was "proper for the judge to instruct on the [G]overnment's theory of the case."

The military judge then proposed the following instruction to respond to the member's question: "I would allow the parties to describe their theories of when and how that may have happened, your job is to consider whether those three events happened on this date." Appellant's counsel responded, "I think that -- even with that language, it's even clearer. That's perfect, Your Honor."

The military judge later instructed the members that the Specification of the Charge

> asks you to determine whether, in your judgement, at any time on 18 September 2020, those three elements occurred: that there was a touching of the buttocks, by the accused; that it was with the intent to gratify sexual desire; and, that it was without consent. So, your duty is to determine whether in your judgement, those three elements occurred at any time, during the course of the 18th. Whether or not it did is ultimately up to you."

The military judge ultimately allowed the trial counsel to argue all the surrounding circumstances could be considered for lack of consent. As to the member's question, the military judge told the panel:

> [O]n Specification 1, I'd refer . . . you to my instructions on the definition of consent, being that "consent" means a freely-given agreement to the conduct at issue by a competent person. The definitions that I've given you to what that entails still apply here. It's for both parties to argue whether or not they think those circumstances are here under the facts of this case. Ultimately, all the surrounding circumstances are to be considered in determining whether a person gave consent.

Appellant's trial defense counsel did not object to the instruction.

During the Government's closing argument, trial counsel stated Appellant committed the "butt massage" while GH "lay in bed next to [Appellant] asleep," and later argued, "He did those things without her consent." The trial counsel closed by stating, "When you consider [GH's] reaction, the DNA proof that corroborates this case, the two stories, the accused's own lies, his confession, there is no alternate conclusion except the accused did these things to her without her consent."

### 2. Law

We review constitutional issues de novo. *United States v. Payne,* 47 M.J. 37, 42 (C.A.A.F. 1997). We review questions of law de novo. *United States v. Watson,* 71 M.J. 54, 56 (C.A.A.F. 2012). The scope, applicability, and meaning of the UCMJ are matters of statutory interpretation we review de novo. *United States v. Gay,* 75 M.J. 264, 267 (C.A.A.F. 2016) (citation omitted).

There is a presumption against the waiver of constitutional rights on appeal. *United States v. Harcrow*, 66 M.J. 154, 157 (C.A.A.F. 2008) (citing *Brookhart v. Janis,* 384 U.S. 1, 4 (1966)). Accordingly, an appellate court will only find an appellant has waived the right to raise a constitutional issue on appeal when it is "clearly established that there was 'an intentional relinquishment or abandonment of a known right.'" *Id.*

"The due process principle of fair notice mandates that an accused has a right to know what offense and under what legal theory he will be convicted." *United States v. Tunstall*, 72 M.J. 191, 192 (C.A.A.F. 2013) (internal quotation marks, citation, and alteration omitted). The Fifth Amendment's due process clause "does not permit convicting an accused of an offense with which he has not been charged." *Id.* (quoting *United States v. Girouard*, 72 M.J. 5, 10 (C.A.A.F. 2011)). Therefore, a specification tried by court-martial will not pass constitutional scrutiny unless it both gives the accused notice of the charge he or she must defend against and shields him or her from being placed in double jeopardy for the same offense. *United States v. Turner*, 79 M.J. 401, 403 (C.A.A.F. 2020) (citations omitted). The military is a notice-pleading jurisdiction. *United States v. Gallo*, 53 M.J. 556, 564 (A.F. Ct. Crim. App. 2000), *aff'd,*

55 M.J. 418 (C.A.A.F. 2001). A specification is sufficiently particular if it "informs an accused of the offense against which he or she must defend and bars a future prosecution for the same offense." *Id.* (citations omitted).

The UCMJ presents various alternative theories of liability for the offense of abusive sexual contact. *See MCM*, pt. IV, ¶ 60.b.(4)(a)–(f). As related to this case, the provision with which Appellant was charged prohibits the commission of sexual contact "without the consent" of the other person, while a separate provision addresses sexual contact committed by a person who knows or reasonably should know "that the other person is asleep, unconscious, or otherwise unaware that the sexual contact" was occurring." *MCM,* pt. IV, ¶ 60.b.(4)(d)–(f).

The canon against surplusage specifies "if possible, every word and every provision" of a statute "is to be given effect and that no word should be ignored or needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." *United States v. Sager*, 76 M.J. 158, 161 (C.A.A.F. 2017). This principle of statutory construction is "strongest when an interpretation would render superfluous another part of the same statutory scheme." *Id.* at 162 (quoting *Yates v. United States*, 574 U.S. 528, 543 (2015)).

"It makes no difference how many members chose one act or the other, one theory of liability or the other. The only condition is that there be evidence sufficient to justify a finding of guilty on any theory of liability submitted to the members." *United States v. Brown*, 65 M.J. 356, 359 (C.A.A.F. 2007) (quoting *United States v. Vidal*, 23 M.J. 319, 325 (C.M.A. 1987)).

An error in the admission of evidence is harmless in the constitutional context when there is no "reasonable possibility that the evidence complained of might have contributed to the conviction." *United States v. Gardinier*, 67 M.J. 304, 306 (C.A.A.F. 2009) (quoting *Chapman v. California*, 386 U.S. 18, 23 (1967)).

### 3. Analysis

Given the constitutional nature of the rights at issue, we decline the Government's request to apply waiver in Appellant's case. We do not find that the record clearly establishes there was an intentional relinquishment or abandonment of known rights. We therefore turn our attention to the merits of Appellant's contentions and review the matter de novo.

Appellant first argues he was convicted of an offense for which he was not on notice. We disagree. At the most basic level, our review of the record shows Appellant was charged in Specification 1 of the Charge with abusive sexual contact requiring proof he acted without the consent of the other person. We find the specification expressly alleged every required element of the offense and informed Appellant he would be required to defend against the offense of

abusive sexual contact without consent. We also find Appellant is sufficiently protected from future prosecution for the same offense.

On appeal, Appellant argues the Government violated his due process rights by switching the events that Specification 1 of the Charge was meant to address. Specifically, Appellant argues he, his trial defense counsel, and "everyone else involved in the court-martial believed that Specification 1 alleged a nonconsensual touching of GH's buttocks while bending over in the kitchen to put cookies in the oven." He further claims the inclusion of him touching GH's buttocks on the air mattress was a "bait and switch" that deprived him of a fair trial. We find the record does not support Appellant's claim.

First, Specification 1 of the Charge has never changed. It reads the same post-trial as it did when it was preferred by Appellant's commander. Notably, Appellant did not request a bill of particulars to clarify the Government's evidence supporting Specification 1. Appellant makes no argument that he was not provided discovery in this case, therefore, he had pretrial access to GH's statements that Appellant had his hand down the back of her underwear while she slept. Appellant also received discovery of his own statements to AFOSI during the investigation where he discussed at least a dozen times touching GH's buttocks on the air mattress. We also note the Government's opening statement made no mention of the incident in the kitchen, but focused heavily on Appellant's conduct on the air mattress. Similarly, the Government's closing argument clearly indicated that the abusive sexual contact on the air mattress was the Government's "primary" focus of prosecution. We find no support for Appellant's claim his due process right to notice was violated.

Next, Appellant argues his due process rights were violated when the military judge erroneously allowed trial counsel to argue a different theory of liability than originally charged. Specifically, Appellant argues the military judge permitted the Government to argue the abusive sexual contact occurred while GH was asleep, as opposed to how it was charged—without her consent. Again, we find the record does not support this argument.

Here, the record details that the military judge properly advised the panel on the elements of the offense, including the Government's obligation to prove beyond a reasonable doubt that GH did not consent to the sexual contact. We see no reason why the Government may not use evidence that GH was asleep— ordinarily the focal point of a prosecution under the theory of while asleep—as circumstantial evidence of the lack of actual consent in a prosecution under a theory of without consent. This conclusion is consistent with our decisions in *United States v. Horne*, No. ACM 39717, 2021 CCA LEXIS 261, at *69–70 (A.F. Ct. of Crim. App. 27 May 2021) (unpub. op.), *aff'd*, 82 M.J. 283 (C.A.A.F. 2022), and *United States v. Williams*, No. ACM 39746, 2021 CCA LEXIS 109, at *53– 54 (A.F. Ct. Crim. App. 12 Mar. 2021) (unpub. op.), *aff'd*, 81 M.J. 450 (C.A.A.F.

2021), where we held circumstances showing a victim's incapacity to consent to a sexual act due to intoxication and inability to consent due to unconsciousness, respectively, could be part of the surrounding circumstances to be considered in deciding whether the accused acted without the consent of the victim. Given the express language that "[a]ll the surrounding circumstances are to be considered in determining whether a person gave consent," the rule against surplusage does not pose any barrier to Appellant's conviction. Article 120(g)(7)(C), UCMJ. In fact, we note trial counsel repeatedly argued "lack of consent" throughout his entire closing argument and never suggested the panel had to find GH was asleep.

Finally, we find nothing in the record to suggest that trial counsel misled the members or asked them to convict Appellant of any offense other than the one for which he was charged. The Government submitted evidence of both Appellant's conduct in the kitchen and on the air mattress. "It makes no difference how many members chose one act or the other, one theory of liability or the other. The only condition is that there be evidence sufficient to justify a finding of guilty on any theory of liability submitted to the members." *United States v. Brown*, 65 M.J. at 359 (quoting *United States v. Vidal*, 23 M.J. at 325).

We find no error by the military judge and no due process violation of any kind occurred during Appellant's trial, and therefore conclude Appellant is not entitled to relief.

## C. Victim Impact Statement

Appellant contends that the military judge abused his discretion by permitting GH's victim impact statement during sentencing. Specifically, Appellant argues that the military judge erred when he allowed GH to discuss the impact of the offenses of which Appellant was acquitted. We agree with Appellant that the military judge erred, but determine Appellant did not suffer material prejudice to his substantial rights and is therefore not entitled to relief.

### 1. Additional Background

During sentencing proceedings, trial defense counsel objected to Court Exhibit A, a victim impact statement offered by GH. GH's victims' counsel sought to admit the statement under R.C.M. 1001(c). Trial defense counsel objected to certain content being outside the scope of a victim impact statement. Specifically related to the issue raised by Appellant on appeal, trial defense counsel objected to the following statement: "I felt disgusted, violated, and physically gross. It dredged up old memories of what happened to me when I was younger. The displeasing feeling of his hand and his penis felt vile." Appellant's trial defense counsel argued that this portion of GH's statement referred to acquitted offenses, and did not directly relate to an offense of which Appellant was found guilty.

After an overnight recess, the military judge issued a final ruling addressing Appellant's objection. His ruling concluded, "Accordingly, acquitted misconduct will be permitted in its brief form in the victim allocation. A curative instruction will also be administered . . . ."

Court Exhibit B is what was eventually given to the members. Relevant to this issue on appeal, Court Exhibit B included the identical language quoted above.

Subsequently, the military judge provided the following instruction to the members:

> During her unsworn statement, the victim made brief reference to the acquitted misconduct in this case, namely that [Appellant] allegedly rubbed his penis on her and penetrated her vulva while she slept. *While the rules for victim allocation are broad and permitted [GH] to say this in her unsworn statement*, the Rules of [sic] Courts-Martial do not permit you to consider that aspect of her statement in arriving at an appropriate sentence in this case. Once again, you may sentence [Appellant] solely for the misconduct of which he has been convicted . . . .

(Emphasis added.)

### 2. Law

Article 6b, UCMJ, grants victims of offenses under the UCMJ the right to be reasonably heard at a sentencing hearing related to the offense. 10 U.S.C. § 806b(a)(4)(B). A victim covered by this right is one "who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense under [the UCMJ]." 10 U.S.C. § 806b(b).

Victims in non-capital cases may exercise their right to be reasonably heard through sworn or unsworn statements. R.C.M. 1001(c)(2)(D)(ii). "[U]nsworn statement[s] may be oral, written, or both." R.C.M. 1001(c)(5)(A). A "crime victim" is one "who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense of which the accused was found guilty." R.C.M. 1001(c)(2)(A).

Statements offered under R.C.M. 1001(c) may include victim impact or matters in mitigation. R.C.M. 1001(c)(3). Victim impact under R.C.M. 1001(c) means "any financial, social, psychological, or medical impact on the victim directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001(c)(2)(B).

Our interpretation of R.C.M. 1001(c) is a question of law we review de novo. *See United States v. Barker*, 77 M.J. 377, 382 (C.A.A.F. 2018) (citation omitted). However, we review a military judge's decision to accept a victim impact

statement offered pursuant to R.C.M. 1001 for an abuse of discretion. *Id.* at 383 (citing *Humpherys*, 57 M.J. 83, 90 (C.A.A.F. 2002)). We find an abuse of discretion when the military judge's "findings of fact are clearly erroneous, the court's decision is influenced by an erroneous view of the law, or the military judge's decision on the issue at hand is outside the range of choices reasonably arising from the applicable facts and the law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008) (citations omitted). "[U]nder the last of these tests" we must find, "'more than a mere difference of opinion'; rather, the military judge's ruling 'must be arbitrary, fanciful, clearly unreasonable or clearly erroneous.'" *United States v. Uribe*, 80 M.J. 442, 451 (C.A.A.F. 2021) (quoting *United States v. Collier,* 67 M.J. 347, 353 (C.A.A.F. 2009)).

When there is error regarding the presentation of victim statements under R.C.M. 1001(c), the test for prejudice "is whether the error substantially influenced the adjudged sentence." *Barker*, 77 M.J. at 384 (quoting *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009)). This is determined by evaluating the relative strength of the parties' cases along with the materiality and quality of the evidence in question. *Id.* (citation omitted). "An error is more likely to be prejudicial if the fact was not already obvious from the other evidence presented at trial and would have provided new ammunition against an appellant." *Id.* (citation omitted).

### 3. Analysis

We find that the military judge abused his discretion by permitting the victim to reference acquitted misconduct in her unsworn statement. We find R.C.M. 1001(c) provides clear guidance on what qualifies as proper victim impact; it states that victim impact "includes any financial, social, psychological, or medical impact on the victim directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001(c)(2)(B). To the extent that the military judge permitted the victim in this case to refer to acquitted misconduct over the Defense's objection, that was error.

In *United States v. Da Silva*, a panel of this court provided the following guidance to military justice practitioners:

> When faced with these situations, we see the military judge's responsibility as two-fold: (1) ensuring [the victim]'s right to be reasonably heard is protected within the parameters of R.C.M. 1001A; and (2) ensuring that if the court members are allowed to hear victim impact information that could be reasonably interpreted by the court members as a comment about an acquitted offense that they are instructed they cannot do so.
>
> . . . .

> *We think the preferable course of action for military judges should be to tailor the unsworn statement instruction.* This preserves a crime victim's right to be reasonably heard while ensuring court members do not wrongly interpret victim impact information that they "must consider." [Special victims' counsel] should be attuned to these concerns and prepared to offer the military judge a tailored instruction which protects their client's right to be reasonably heard while simultaneously making sure that appellate error is not unnecessarily introduced because their client's statement could be reasonably viewed as commenting on an acquitted offense.

No. ACM 39599, 2020 CCA LEXIS 213, at *53–54 (A.F. Ct. Crim. App. 25 Jun. 2020) (unpub. op.) (emphasis added). The military judge cited to *Da Silva* when explaining his decision to allow GH to refer to acquitted misconduct in her unsworn statement, and to address the statement with a tailored instruction to the court members. However, military judges should not interpret *Da Silva* to mean that they should allow court members to receive unsworn victim statements that exceed their proper scope under R.C.M. 1001(c). "[T]he military judge has an obligation to ensure the content of a victim's unsworn statement comports with the parameters of victim impact or mitigation as defined by" the rule. *United States v. Tyler*, 81 M.J. 108, 112 (C.A.A.F. 2021) (citing R.C.M. 1001A, Discussion). In *Da Silva*, this court addressed a situation in which the victim's unsworn statement included ambiguous language susceptible of "two possible interpretations" which might or might not have implicated acquitted conduct. Unpub. op. at *52. In that situation, *Da Silva* explained that a "standard unsworn statement instruction" was potentially inadequate, and an instruction tailored to the circumstances would have been the "preferable course." *Id*. at *54. The instant case is different in that the military judge unambiguously identified references to acquitted conduct in GH's unsworn statement which exceeded what R.C.M. 1001(c) permits, then declared victim unsworn statements are permitted to exceed this scope and allowed GH's statement to go to the court members. To the extent *Da Silva* was unclear about whether victim unsworn statements may be allowed to address improper matters, the United States Court of Appeals for the Armed Forces' subsequent opinion in *Tyler* clearly states the military judge's obligation to restrict their contents.

We now turn our attention to whether the portion of GH's written statement described above substantially influenced the sentence by evaluating the relative strength of the parties' cases along with the materiality and quality of the evidence in question. *See Barker*, 77 M.J. at 384 (citation omitted). We find it did not. Here, we find the first two factors are essentially equal. The Government's sentencing case was strong, as was Appellant's sentencing case.

The final two factors of the prejudice analysis, materiality and quality, require us to assess how much GH's reference to acquitted offenses in her unsworn statement may have affected the court-martial. We find that GH's unsworn victim statement did contribute to the Government's case. It provided insight on how Appellant's actions affected her life. However, we find the very small portion of statement that referenced acquitted misconduct only amounted to one sentence in a statement that was almost two pages in length. We find that the military judge's instruction substantially mitigated the error. Here the military judge specifically instructed the members that they could not consider GH's reference to acquitted misconduct in determining an appropriate sentence. Court members are presumed to follow the military judge's instructions absent evidence to the contrary. *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000). We also find it important that this was not the first time the members had heard from GH as she testified during trial. GH's unsworn statement did not provide any new ammunition against Appellant such as uncharged misconduct, and trial counsel did not argue this portion of her unsworn statement as justification for the sentence recommendation.

In conclusion, after evaluating the four factors, we do not find that the error substantially influenced the adjudged sentence. *See Barker,* 77 M.J. at 384 (citation omitted).

**D. Sentence Severity**

Appellant contends his sentence is inappropriately severe. He asks that we use our authority under Article 66(d), UCMJ, 10 U.S.C. § 866(d), to modify his sentence. We are not persuaded Appellant's sentence is inappropriately severe and find no relief is warranted.

"We review sentence appropriateness de novo." *United States v. Datavs*, 70 M.J. 595, 604 (A.F. Ct. Crim. App. 2011) (citing *United States v. Baier*, 60 M.J. 382, 383–84 (C.A.A.F. 2005)), *aff'd*, 71 M.J. 420 (C.A.A.F. 2012). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense, the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam) (citations omitted). While we have great discretion in determining whether a sentence is appropriate, we are not authorized to engage in exercises of clemency. *See United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citation omitted).

We have conducted a thorough review of Appellant's entire court-martial record, including his record of service, and all matters submitted in extenuation and mitigation. We find that the nature and seriousness of the offense clearly support the adjudged sentence of a bad-conduct discharge, confinement for six months, reduction to the grade of E-1, and a reprimand. Understanding

we have a statutory responsibility to affirm only so much of the sentence that is correct and should be approved, Article 66(d), UCMJ, we conclude the sentence is not inappropriately severe and we affirm the sentence as adjudged.

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the approved findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court